UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JAMIE FELD, et al.,

                                Plaintiff,                          19-cv-3899 (PKC)

        -against-

                                                                  OPINION
                                                           AND ORDER

POSTMATES, INC.,

                                Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        Plaintiff Jamie Feld has filed a putative class action against Postmates, Inc. ("Postmates"), alleging violations of New York General Business Law § 349 and unjust enrichment. (Compl. (Doc 1).) Postmates argues that this Court lacks jurisdiction over this matter and moves to compel arbitration on the grounds that Feld entered into a binding arbitration agreement with Postmates when she signed up for and used Postmates' service. (Doc 22; Def.'s Mem. of Law (Doc 23) at 1-2.) For the reasons explained below, Postmates' motion will be granted.

BACKGROUND

        Postmates is an online marketplace where consumers can place orders from restaurants or other retailers and independent contractor-couriers deliver users' orders. (Ashley Campbell Decl. of Aug. 26, 2019 (Doc 23-1) ¶ 2.) Postmates operates both a website and a mobile application (the "App").[1] (Id.) Consumers must create a Postmates account, either on

---
[1] Postmates notes that the sign-up screens on the App for Android phones and for iOS (iPhones) were the same from January-March 2019, but that the Android screen changed in March 2019. (Supp. Campbell Decl. (Doc 26-1), Exs.

the website or using the App, in order to place orders on Postmates' platform. (Id. ¶ 3.) When creating a Postmates account, a consumer signs up using his or her email address and a password; consumers may also sign up by connecting to their Facebook accounts. On the Postmates website sign-up screen, below the email and password fields and above the "Sign Up" and "Facebook" buttons is the following disclaimer: "By clicking the Sign Up or Facebook button, you agree to our **Terms of Service** and **Privacy Policy**." (Id. ¶¶ 5-6) (emphasis in original). The bolded "Terms of Service" and "Privacy Policy" denote hyperlinks on which a consumer can click to read these policies. (Id.) A consumer sees a similar screen while signing up on the App; he or she may sign up using an email address and password or Facebook account. Above the "Sign Up" and "Facebook" buttons on the App sign-up screen is the following disclaimer: "By tapping the Sign Up or Facebook button, you agree to our **Terms of Service** & **Privacy Policy**." (Id. ¶ 7.) These bolded terms also denote hyperlinks, as on the website. (Id.) A consumer may skip signing up on the App by clicking "Skip for Now" on the App sign-up screen, but may not place an order until he or she signs up using a similar interface. (Id. ¶ 8.)

Postmates' Terms of Service ("TOS") include a mandatory arbitration clause and state that users waive their right to "bring [] class or representative action[s]" against Postmates. (Doc 23, Ex. A (Terms of Service, Jan. 18, 2019) at 1.) The first page of the TOS provides, in relevant part:

> **These Terms provide that with limited exceptions covered by Section 17.3 of these Terms all disputes between you and Postmates arising out of or relating to these Terms or your use of the PLATFORM (the "Disputes") will be resolved by BINDING ARBITRATION. For such Disputes, YOU waive YOUR RIGHT TO bring a class or representative action, or GO TO COURT under these Terms.**

---

A-C.) This change does not affect the Court's analysis here, and therefore the Court refers to these interfaces collectively as the "App."

(Id.) (emphasis in original). The full arbitration provision is set out further in section 17 of the TOS, titled "Dispute Resolution and Arbitration." (Id. at 22-27.) The arbitration provision has three exceptions, set out in section 17.3, that allow users to bring individual actions in small claims court, to pursue an enforcement action in the applicable federal, state, or local agency where such action is available, and to file suit in court to adjudicate an intellectual property dispute. (Id. at 23-24.)

Feld signed up for Postmates in 2019, and initiated this putative class action on May 1, 2019. (Doc 1 ¶ 9.) Feld alleges that Postmates committed deceptive acts or practices in violation of New York Business Law § 349 and has been unjustly enriched. (Id. ¶¶ 69-86.) Feld contends that Postmates' marketing statement that it delivers "Anything. Anytime. Anywhere." is materially false and misleading because the service only provides delivery from "a specific set of vendors at specified times and locations." (Id. ¶¶ 39-42.) Further, Feld states that Postmates' statement that its service operates with a set delivery fee is misleading because Postmates also charges a "hidden" service fee. (Id. ¶¶ 41-43.) The proposed class would include "all New York persons (i.e., consumers and non-consumers) who have used Postmate's [sic] services, during the period extending from January 15, 2012, through and to the filing date of this Complaint." (Id. ¶ 55.)

On August 26, 2019, Postmates moved to compel arbitration, arguing that plaintiff entered into a binding and enforceable arbitration agreement with Postmates when she signed up to use the service. (Doc 23 at 7.) Feld contends that she never agreed to the TOS when signing up for and using the service because, inter alia, the TOS was never actually shown during the sign-up process, Postmates never required consumers to express affirmative assent to the TOS, the hyperlinks to the TOS were on a "cluttered screen" that gave consumers insufficient

notice of the TOS and its binding arbitration clause, and Postmates did not otherwise give plaintiff and other putative class members notice of Postmates' terms and policies. (Doc 1 ¶¶ 17-37.) Feld maintains that Postmates "obscured and minimalized" the TOS and Privacy Policy hyperlinks because they were presented in a smaller font and were less visible than the "Sign Up" button and other site features. (Id. ¶¶ 32-37.) Plaintiff does not state whether she signed up for Postmates using the website or the App.

LEGAL STANDARD

Arbitration is a matter of contract, and "the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986). Where contracts contain arbitration clauses, "there is a presumption of arbitrability . . . . [d]oubts should be resolved in favor of [arbitration]." Id. at 650 (internal quotation marks and citation omitted). The Federal Arbitration Act ("FAA"), which "reflects a liberal federal policy favoring arbitration agreements," Meyer v. Uber Techs., Inc., 868 F.3d 66, 73 (2d Cir. 2017) (internal quotation marks and citation omitted), provides, in relevant part: "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

When determining whether a dispute should be arbitrated, a court must answer two questions: (1) whether there is a valid agreement to arbitrate, and, if so, (2) whether the subject of the dispute is within the scope of the arbitration agreement. Nat'l Union Fire Ins. Co.

of Pittsburgh v. Belco Petroleum Corp., 88 F.3d 129, 135 (2d Cir. 1996). Whether an arbitration agreement exists is a matter of state contract law. Meyer, 868 F.3d at 73-74. The party seeking to compel arbitration bears the burden of establishing the existence of an arbitration agreement, although "[t]his burden does not require the moving party to show initially that the agreement would be enforceable, merely that one existed." Hines v. Overstock.com, Inc., 380 F. App'x 22, 24 (2d Cir. 2010) (emphasis in original). The Court applies a "standard similar to that applicable for a motion for summary judgment" when deciding a motion to compel arbitration. Meyer, 868 F.3d at 74 (internal quotation marks and citation omitted). If the Court determines that the parties have agreed in writing to arbitration, then the Court will stay the proceedings. Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016).

"[N]ew commerce on the Internet . . . has not fundamentally changed the principles of contract." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004). Internet-based agreements between users of a platform and a service provider have been grouped into four categories: (1) browsewrap; (2) clickwrap; (3) scrollwrap; and (4) sign-in-wrap. Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 394 (E.D.N.Y. 2015) (Weinstein, J.). Sign-in-wrap agreements, applicable here, "do not require the user to click on a box showing acceptance of the 'terms of use' in order to continue. Rather, the website is designed so that a user is notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-in or login process." Id. at 399. Sign-in-wrap agreements have been upheld where: (1) hyperlinked "terms and conditions" are "next to the only button that will allow the user to continue use of the website;" (2) "the user 'signed up' to the website with a clickwrap agreement and was presented with hyperlinks to the 'terms of use' on subsequent visits;"[2] and (3) "notice of

---

[2] A "clickwrap" agreement requires a user to click a box indicating affirmative acknowledgment and acceptance of a website's TOS before proceeding to use the site. Berkson, 97 F. Supp. 3d at 397.

- 5 -

the hyperlinked 'terms and conditions' is present on multiple successive pages on the site." Id. at 401 (collecting cases). In sum, "district courts considering similar agreements have found them valid where the existence of the terms was reasonably communicated to the user." Meyer, 868 F.3d at 76.

The categorization of types of web-based contracts, however, is not dispositive. Meyer, 868 F.3d at 76. Where, as here, an offeree claims not to have actual notice of the terms of the contract, the question becomes whether a reasonably prudent person would have been on inquiry notice of the terms such that the offeree would still be bound by the contract. Id. at 74-75; Schnabel v. Trilegiant Corp., 697 F.3d 110, 120 (2d Cir. 2012) ("[W]here there is no actual notice of the term, an offeree is still bound by the provision if he or she is on inquiry notice of the term and assents to it through the conduct that a reasonable person would understand to constitute assent.") (emphasis in original). Whether a user is on inquiry notice is a fact-intensive analysis. Meyer, 868 F.3d at 76 (citing Schnabel, 697 F.3d at 124). Inquiry notice depends on the "clarity and conspicuousness of arbitration terms." Id. at 75 (internal quotation marks and citation omitted). In the context of Internet-based contracts, "clarity and conspicuousness are a function of the design and content of the relevant interface." Id. An arbitration agreement "exists where the notice of the arbitration provision was reasonably conspicuous and manifestation of assent unambiguous as a matter of law." Id. at 76; Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 35 (2d Cir. 2002).

DISCUSSION

A. Existence of an Arbitration Agreement between Feld and Postmates

The first question is whether Feld, who denies ever reading Postmates' TOS, was on inquiry notice of the terms and manifested assent to create a binding arbitration agreement.

Whether an arbitration agreement exists is a question of state contract law. Meyer, 868 F.3d at 73-74. Postmates' TOS contain a California choice of law provision. (Doc 23, Ex. A at 29.) As the Second Circuit has noted, "New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term." Meyer, 868 F.3d at 74 (internal quotation marks and citation omitted). Under California law, mutual assent may be in writing or by conduct, and in the context of web-based contracts, the offer must be reasonably conspicuous and "make clear to the consumer that clicking . . . would signify assent to those terms." Specht, 306 F.3d at 29-30 (applying California law).

Here, as in Meyer, inquiry notice depends on whether the hyperlinked TOS on the Postmates sign-up screen was reasonably conspicuous. 868 F.3d at 77. The Court considers the perspectives of a reasonably prudent smartphone or Internet user, and does not "presume that the user has never before encountered an app or entered into a contract using a smartphone." Id. Even though Feld does not explain whether she used the Postmates website or the App to sign up for the service, the same conclusion obtains; the Court has reviewed both interfaces, and finds that they each provide sufficient inquiry notice.

1. Whether TOS Were Reasonably Conspicuous

Following the Second Circuit's analysis in Meyer, the Court concludes that the hyperlinked TOS on both the Postmates website and App are reasonably conspicuous to the prudent user. On the Postmates website, a white "Sign Up" box appears with spaces for a user to enter his or her email address and a password. (Pl.'s Opp'n Br. (Doc 25) at 8.) The sign-up box pops up in front of the Postmates home screen that is decorated with pictures of food, but the sign-up box itself has a white background with black and grey text that is clear and conspicuous. (Id.) This interface is similar to the sign-up box in Meyer (the Uber sign-up page), which the

Second Circuit found to provide conspicuous notice of hyperlinked terms of use given the uncluttered screen with fields for a user to enter his or her payment information. Meyer, 868 F.3d at 78; cf. Nicosia, 834 F.3d at 236 (cluttered order page insufficient to provide inquiry notice).

Below the spaces for a user's email and password, and above the "Sign Up" and "Facebook" buttons is the following text: "By clicking the Sign Up or Facebook button, you agree to our **Terms of Service** and **Privacy Policy**." (Doc 25 at 8) (emphasis in original). That the notice and hyperlinks are in a smaller font size does not render the disclaimer inconspicuous; the grey and black color contrast against the white background and are clear to the reasonably prudent user creating an account. Meyer, 886 F.3d at 78. The hyperlinks to the TOS and Privacy Policy are in a darker, bolder font than the rest of the text, signifying to a reasonably prudent user that these would be clickable terms. See Meyer, 868 F.3d at 77-78; cf. Applebaum v. Lyft, Inc., 263 F. Supp. 3d 454, 467 (S.D.N.Y. 2017) (finding "no familiar indicia to inform consumers that there was in fact a hyperlink that should be clicked and that a contract should be reviewed, such as words to that effect, underlining, bolding, capitalization, italicization, or large font."). This notice showing the hyperlinks is "spatially coupled" with the sign-up button, i.e., the text appears directly above the sign-up options on the same screen without requiring the user to scroll to see the notice. Meyer, 868 F.3d at 78; Starke v. SquareTrade, Inc., 913 F.3d 279, 291-92 (2d Cir. 2019) (citing Meyer). The notice and the sign-up options are also "temporally coupled," i.e., the notice appears at the time of account creation, such that "reasonably prudent [] user would understand that the terms were connected to the creation of a user account." Meyer, 868 F.3d at 78.

That the contents of the TOS do not appear on the screen or that Postmates does not require a "user to actually examine the terms before assenting" does not change the analysis. Fteja v. Facebook, 841 F. Supp. 2d 829, 837-38 (S.D.N.Y. 2012); see also Meyer, 868 F.3d at 78-79. The Supreme Court has found contract terms enforceable where a consumer was directed elsewhere to review the relevant terms. Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 587-88 (1991) (cruise ticket forum-selection clause enforceable; ticket directed passengers to review conditions of contract on "last pages 1, 2, 3"). Indeed, "clicking the hyperlinked phrase is the twenty-first century equivalent of turning over the cruise ticket" to read the fine print. Fteja, 841 F. Supp. 2d at 839 (plaintiff assented to Facebook's forum selection clause in Terms of Use where the user was "prompted to examine the terms of sale that are located somewhere else," regardless of whether the user actually read the terms). Whether Feld actually clicked on the hyperlinked terms to read the TOS or the Privacy Policy is immaterial; what matters is that notice of these terms was reasonably conspicuous.

Finally, the language of the notice that by "clicking the Sign Up or Facebook button, you agree to [Postmates'] **Terms of Service** and **Privacy Policy**" put reasonably prudent users on inquiry notice. This is a "clear prompt directing users to read the [TOS] and signaling that their acceptance of the benefit of registration would be subject to contractual terms." Meyer, 868 F.3d at 79.

The App sign-up interface also provides users with conspicuous notice of Postmates' TOS. The App has an uncluttered, solid background—although it is not white—on which the following notice appears visibly: "By tapping Sign Up or Facebook, you agree to the **Terms of Service** & **Privacy Policy**."[3] (Doc 26, Exs. A-C.) This notice is almost identical to

---

[3] The Court notes the current Android App sign-up screen has a white background. (Doc 26, Ex. A.) The prior Android sign-up screen referred to Postmates' policies as "our" policies instead of "the." (Id., Ex. B.)

the one on Postmates' website. The "Terms of Service" and "Privacy Policy" terms appear in blue type that contrasts with the sign-up page background, indicating that they are hyperlinks; the remainder of the text is black. The notice is spatially and temporally coupled with signing up for Postmates' service on the App: the notice and hyperlinks are directly above buttons allowing users to choose to sign up using their Facebook accounts or email addresses, and the notice appears at the time a user is creating an account.

The cases plaintiff cites to the contrary are factually distinguishable. The hyperlink to the TOS containing the arbitration provision at issue here is presented to users while signing up for the service, not while placing an order on a cluttered page or receiving a text-heavy email after making a purchase. See, e.g., SquareTrade, 913 F.3d at 292-93 (no reasonable notice of arbitration agreement where the terms were to be accessed via hyperlink that was never clearly brought to user's attention in cluttered post-sale email, and user was never "advise[d] . . . that he would be deemed to agree to the contract terms in the document to be found by clicking that link."); Nicosia, 834 F.3d at 236-37 (applying Washington law, finding inconspicuous notice of Amazon's terms on a cluttered order page); Long v. Provide Commerce, Inc., 200 Cal. Rptr. 3d 117, 124-26 (Cal. Ct. App. 2016) (reviewing browsewrap agreement, finding "Terms of Use" hyperlinks insufficiently conspicuous to put customer on notice during purchase process where hyperlinks were difficult to find and not "located next to the fields and buttons a consumer must interact with to complete his order.") (internal quotation marks omitted). Further, Postmates' sign-up process includes "cautionary language" that by signing up, users agree to the TOS and Privacy Policy. Cf. Applebaum, 263 F. Supp. 3d at 466-68 (registration for Lyft ride-sharing service "did not alert reasonable consumers to the gravity of the 'clicks,' namely, that clicking the [b]ox . . . constituted acceptance of a contract, including an arbitration agreement" where,

among other reasons, there was no "cautionary language to indicate that there were contractual terms for review").

For these reasons, the Court concludes that Postmates' TOS on its website and the App were reasonably conspicuous, such that a prudent user would be on inquiry notice of the terms.

    2. <u>Manifestation of Assent</u>

Postmates' website and App sign-up screens put users on notice that by signing up for its service, they were agreeing to Postmates' TOS and Privacy Policy. Here, as in <u>Meyer</u>, the "physical proximity of the notice to the register button and the placement of the language in the registration flow make clear to the user that the linked terms pertain to the action the user is about to take." 868 F.3d at 80. By signing up for Postmates' service, Feld manifested assent to the TOS, even if she did not click on the hyperlink to read the contract. Courts in this District have reached the same conclusion on similar facts. <u>See, e.g.</u>, <u>Starke v. Gilt Groupe, Inc.</u>, No. 13 Civ. 5497 (LLS), 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) (manifesting assent where user clicked "Shop Now" on site that informed users that doing so would subject them to the site's "Terms of Membership"); <u>Fteja</u>, 841 F. Supp. 2d at 838-41 (by signing up for social networking site, user assented to Facebook's forum selection clause in hyperlinked "Terms of Use" where Facebook "informed [the user] of the consequences of his assenting click and he was shown, immediately below, where to click to understand those consequences.").

The Court concludes that Postmates' TOS were reasonably conspicuous to the prudent Internet user such that Feld was on inquiry notice of the terms, and that Feld manifested assent by signing up for Postmates' service. Therefore, an agreement to arbitrate exists between the parties.

B.  Scope of the Arbitration Provision

The next question is whether the dispute in this case is governed by the arbitration provision.  The Court concludes that it is.

The Court first determines whether an arbitration clause is broad or narrow. Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001).  At all times relevant to this action, Postmates' TOS included an arbitration clause.  (Doc 23-1 ¶¶ 11-12, 17; Doc 23-1, Ex. A at 1, 22-27; Doc 23-1, Ex. B. at 1, 22-27.)  The first page of the TOS notifies users—in bold font—that subject to certain exceptions, disputes between users and Postmates "**arising out of or relating to these Terms or [] use of the PLATFORM . . . will be resolved by BINDING ARBITRATION. For such Disputes, YOU waive YOUR RIGHT TO bring a class or representative action, or GO TO COURT under these Terms.**" (Doc 23-1, Ex. A at 1.)  The binding arbitration provision is further detailed in section 17 of the TOS, and includes the following bolded language: "**YOU UNDERSTAND AND AGREE THAT, BY ENTERING INTO THESE TERMS, YOU AND POSTMATES ARE EACH WAIVING THE RIGHT TO GO TO COURT OR TO PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION.**" (Id. at 23.)  "Expansive language" such as this renders Postmates' arbitration clause broad, which creates a presumption of arbitrability.  Louis Dreyfus, 252 F.3d at 224-25.  There are three exceptions to the arbitration provision, none of which applies here.  (Doc 23-1, Ex. A at 23-24.)

Therefore, the Court concludes that the disputes raised in Feld's complaint fall within the scope of the arbitration provision.

CONCLUSION

Defendant's motion to compel arbitration is GRANTED. The Clerk is directed to terminate the motion (Doc 22). Proceedings are stayed pending arbitration. The parties shall update the Court on the status of the arbitration by June 30, 2020.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
March 3, 2020